M. V. BURCH, Appellant, v. J. A. WICKLIFF et al., Appellees.

No. 39860.

OCTOBER 22, 1929.

PETITION FOR REHEARING WITHDRAWN JANUARY 13, 1930.

*M. L. Beckwith, O. M. Slaymaker,* and *R. E. Killmar,* for appellant.

*J. B. Hockersmith* and *Johnson & Teter,* for appellees.

KINDIG, J.—The real estate involved is an 80-acre farm located approximately 5 miles northwest of Knoxville. Dispute arises between the parties as to who is the owner of the realty. On the one hand, plaintiff-appellant claims said real property; while, on the other, the defendant-appellee J. A. Wickliff asserts that it belongs to him. So the appellant seeks to oust the appellees from the possession thereof, and in response thereto, the latter ask that their title therein be quieted against the former.

Appellant became the owner of the premises about May 24, 1894. A deed thereto was given him by his stepmother, Amelia Burch. No transfer of the 80-acre tract, through deed or other written document, was ever made by appellant to the appellee J. A. Wickliff, or any other person. J. A. Wickliff, the appellee, asserts that he acquired title through adverse possession for a period exceeding 10 years, under "claim of right" based upon an oral contract of purchase. This oral agreement, according to the appellees' testimony, arose in March, 1903. Some preliminary facts leading up to the event will perhaps aid the understanding. Appellee J. A. Wickliff was employed by the appellant sometime before the year 1900. On February 28, 1900, the

appellees, who are husband and wife, moved on the farm as the tenants of the appellant. That tenancy was for a term of three years. At the end thereof, as before suggested, the appellees maintain that the appellant orally agreed to and did sell the disputed realty to the appellee J. A. Wickliff, for an agreed consideration of $50 an acre, which, in the aggregate, is $4,000. Opposed to that contention is the assertion of appellant that, at the end of said 3-year term, new tenancy was contracted for another term. He declares there was no sale.

I. After carefully considering the entire record, however, we are constrained to hold that, on or about the time alleged, the appellant did enter into said oral agreement with the appellee J. A. Wickliff for the sale of the farm. In support of this conclusion may be found both direct and circumstantial evidence.

Mr. Wickliff, the appellee, says unequivocally that he made the purchase in the manner and way above set forth. Contradictory to Mr. Wickliff's statements in this regard is the testimony of the appellant in denial thereof, although, in so doing, the appellant does admit that he and the appellee J. A. Wickliff did have some talk in 1903 concerning the purchase of the property by the latter from the former. It is said by the appellant that terms were not agreed upon, and that he executed a deed in blank, and left it with one Freel, at Pleasantville (a town near Knoxville), for delivery to whosoever might buy, and pay the required purchase price. Corroboration for appellee Wickliff, nevertheless, appears in the testimony of his wife, the other appellee. She says:

"I did not hear any conversation or know of any conversation about the purchase of this land from Mr. Burch [appellant] at the time it was done; I knew it that day when he [appellee J. A. Wickliff] came home. Mr. Wickliff [appellee] told me. * * * I saw Mr. Wickliff [appellee] hand Mr. Burch [appellant] a check. I think the amount was something over $300. * * * The first time I heard any talk about buying this land or selling this farm was the spring we [appellees] bought it. * * * I knew they [appellant and appellee J. A. Wickliff] were talking about selling the place, instead of leasing it, because Mr. Burch [appellant] and Mr. Wickliff [appellee] told me he [appellee J. A. Wickliff] had bought it. They [appellant and appellee J. A.

Wickliff] told me that, not long after we [appellees] bought it, in 1903. Mr. Burch [appellant] said to me: 'Al [appellee] bought it,' and he [appellant] thought it was a pretty good idea."

Furthermore, corroboration of appellees' claim is found in the testimony of State Senator W. A. Clarke, appellant's brother-in-law. Senator Clarke said:

"* * * I had heard that Mr. Wickliff [appellee] had bought the 80 acres in controversy. That was talked probably in 1903 or 1904. In fact, Mr. Wickliff [appellee] had told me that he had bought it, so I said to Mr. Burch [appellant] one day * * *: 'I understand that Wickliff [appellee] bought your farm,' or words to that effect, and he answered me in this way: 'Yes,' he said, 'we [appellant and appellee J. A. Wickliff] have had a kind of a contract.'"

Circumstantial evidence also lends strong support for the proposition that the property was sold to appellee. From the date of the alleged transaction until the commencement of this suit, appellant at no time demanded rent from appellee. About 1905, appellant left the community and went to Colorado. During that period, appellees were in possession of the real estate. Then, in two or three years, appellant returned from Colorado, and again lived at or near Pleasantville, the vicinity of the farm in dispute. But appellant, although in the locality of the farm, did not in any way disturb appellee in his possession thereof, or demand any rent from him. Thereafter, in March, 1910, appellee again left Iowa, and did not return again until February, 1928. Apparently throughout such absence appellant paid no attention whatever to appellee's land, and, so far as the former was concerned, the latter was at liberty to possess, manage, and use the premises as he saw fit. Important in this consideration is the fact that appellant owned another farm of 120 acres in the neighborhood, and some other property within a near-by town. Throughout all his absences, appellant left his brother-in-law, Senator Clarke, aforesaid, or some other reliable person, in charge of the 120 acres and the town property. Yet no one looked after or managed appellee's 80 acres for appellant. If appellees are mistaken about their purchase of this farm, why did appellant

desert it, demand no rent for its use, and leave the appellees in possession, to do with it as they chose? Significant, too, is the fact that appellees, at all times after the alleged purchase, treated the 80 acres as their own. For instance, they "paid the insurance on buildings; moved, shingled, plastered, and refloored the house; built fences; cleaned out about three fourths of a mile of old hedge; constructed a cattle shed, 22x26; erected a henhouse, 32x32; made a cave; dug the well deeper, and cemented it up; set out an orchard of small fruit trees; put in every fence post on the place; expended about $500 for woven-wire fences."

The appellees, it is true, never received a deed from appellant. Explanation thereof is offered by the appellees. They say that, when the final payment was made, some talk was had with appellant in reference to a deed, and he gave them to believe that he would make and deliver the same. Nevertheless, before this was done, he left the community, and remained out of Iowa for many years. Two attempts were made, it appears, to procure a deed from appellant after he left Iowa; because, on two different occasions, the appellee J. A. Wickliff had a deed prepared, and mailed it to the appellant, with the request that he sign, acknowledge, and return it. Such, however, was never done. Several years after the appellant left Iowa, he, through a letter, demanded of Freel the return of the blank deed above described, which was said to have been left with the latter in 1903. Hence, Freel returned it. Demand for that deed was not made by appellees because, they explained, its presence in Freel's office was not known to them. Inquiry concerning appellant's deed, however, was made of Freel by appellees about two or three years before the trial.

Someone commenced an attachment suit against appellant in the year 1921, and levy thereunder was made on appellees' 80 acres of land. Intervention was made in that suit by appellees, and in their pleadings they set up the fact that they, and not appellant, owned the property. Notice of the foregoing proceeding, however, was not given to appellant. Appellees rented the farm as their own to a tenant during the years 1921 and 1922, when they went to the state of Missouri. Rent therefor was collected by appellees. Early in the year 1923, appellees again moved back to this farm, and have lived there ever since.

Our attempt has not been to set out all the facts and circumstances, but rather, to detail the general outline thereof.

Considerable confusion arises concerning the payment of taxes. Undoubtedly, appellant paid them for many years after the sale, but later, they were taken care of by appellee. Part of the time, at least, appellant had money in a local bank, which institution was authorized to pay for him the taxes on his land in Marion County. There being no deed to appellees for the property in question, of course it was taxed in the name of appellant. When the bank called for appellant's taxes, the county treasurer included in the list the 80 acres in dispute. Payment, then, by appellant to some extent can be explained. Doubtless appellant did himself pay some of the subsequent taxes. The assessor each year conferred with appellee J. A. Wickliff, and upon these occasions he claimed ownership of the real estate, but explained to the official that the deed had never been delivered. Manifestly, without a deed to appellees, the title would stand in the name of appellant, and the assessment thereof would be made accordingly. Attention is called by appellant to appellees' delinquency in not paying the taxes during some of the later years, after the former had ceased doing so. As a result of such nonpayment, a tax sale was had, and a certificate issued thereunder. Responding to that argument, appellee J. A. Wickliff maintains that he purposely permitted the land to sell for taxes, in order that he might thereby obtain a tax deed, and, through that means, procure legal title. Appellant finally explains why he concluded to oust appellees from their home. Regarding this, appellant testified:

"I learned that Mr. Wickliff [appellee] was claiming to be the owner of this 80-acre tract here when I came to Indianola last fall [1927]. Mr. Bulman [a lawyer], of Chariton, came up there, and told me [appellant] about it, and to get a job, besides [to be employed by appellant to defeat appellees' claim]; and he [Bulman] said Wickliff said it [the farm] was his; he [appellee] had paid for it."

Having considered all the facts and circumstances, it appears obvious to us, as it did to the trial court, that the oral contract of purchase was made as and when alleged by appellees. Resultantly there was a basis for appellees' claim of right under

which this property was held adversely to appellant for a period of approximately 25 years, because such claim may be based upon an oral agreement. *Hamilton v. Wright,* 30 Iowa 480; *Montgomery County v. Severson,* 64 Iowa 326; *Quinn v. Quinn,* 76 Iowa 565; *Libbey v. Young,* 103 Iowa 258; *Goulding v. Shonquist,* 159 Iowa 647; *Ratigan v. Ratigan,* 181 Iowa 860.

II. Even though the above and foregoing be true, appellant urges that the consideration was never paid, and therefore the appellees had no interest which could ripen into a claim of right for adverse possession. Evidence of payment does appear in the record, together with appellant's denial thereof. Both appellees tell about the payments made. Each remembers the final one. Mrs. Wickliff says practically everything they earned from or raised on the farm went to satisfy this purchase price, and Mr. Wickliff tells how he rented other land, in addition to his own, in order that he might procure funds with which to meet the obligation. From time to time, live stock was sold, and sufficient funds obtained thereby. It is claimed that the final check or receipt was burned, by mistake. But whether there was payment or not, it is enough for the purpose of adverse possession that the appellees had a claim of right, and held possession openly and in good faith. *Lemker v. Unknown Claimants,* 201 Iowa 902; *Bryan v. Christianson,* 188 Iowa 669. Upon this subject, we said, in the *Christianson* case:

"Plaintiff does not claim that he has, or that he ever had, any color of title, so that we need not consider that question. He does claim that he had a claim of right, and that he occupied the property adversely under such claim. We pointed out in *Goulding v. Shonquist,* 159 Iowa 647, that there must be some claim of right or title or interest in the property by which the possessor, in good faith, supposes he has a right to the property as a basis for adverse possession. It is not necessary that the claim of right be a valid and legal one."

In the case at bar, appellees had a valid claim of right, and held possession under the best of faith. Their possession was adverse, continuous, and open. Consequently, whether they have paid the full consideration, as a matter of fact, is not material now, for the purposes of this suit.

III. Using the fact that appellees were the former tenants

of appellant as a major premise, it is concluded by the latter that title through adverse possession could not, therefore, be  acquired against him. Of course, "so long as the relation of landlord and tenant exists, the tenant cannot acquire an adverse title as against his landlord." 1 Ruling Case Law 747, Section 68; *Bowdish v. City of Dubuque,* 38 Iowa 341; *Stout v. Merrill,* 35 Iowa 47. Implication appears in each citation that, after the expiration of the lease, there is nothing to prevent a former tenant, under some new relationship, from holding adversely to the previous landlord.

"If possession is originally acquired in subordination to the title of the true owner, there must be a disclaimer of the title from him, and actual hostile possession, of which he has notice, or which is so open and notorious as to raise a presumption of notice. These rules are well settled * * *." *McClenahan v. Stevenson,* 118 Iowa 106.

Underlying appellees' basis for the relief prayed is the thought that the previously existing tenancy entirely ceased, and at the end of the term thereof, there was created a new relationship by the oral agreement aforesaid: to wit, that of vendor and vendee. By entering into that oral contract, the appellant did renounce his superior title to the farm, and agreed that it was to be J. A. Wickliff's property, for the consideration of said $4,000. Adverse title was acquired by appellees through the very sale contract itself. Thereby appellees and appellant renounced the idea of tenancy, and entered into a new relationship; and it is under this latter status that appellees' right accrued through adverse possession. That they were formerly landlord and tenant does not preclude this. 1 Ruling Case Law 747, Section 68. Such pre-existing tenancy, under the circumstances, is quite immaterial, for appellant knew that it had ceased at the time the sale was consummated.

IV. Complaint is made by appellant that there was no foundation upon which the trial court could predicate notice of appellees' adverse holding. About this appellant is mistaken.

To begin with, appellant had entered into a contract with appellees, whereby the ownership of the land was transferred to the latter. Thus, notice of an adverse holding automatically arose from that transaction. Appellees immediately went into possession, and appellant knew that. They improved the premises extensively, and the world could see that. Forsooth, appellees acted as owners in possession. All those facts and circumstances constituted sufficient notice to appellant. *Lemker v. Unknown Claimants* (201 Iowa 902), supra; *Consolidated Sch. Dist. v. Thompson,* 194 Iowa 662. Concerning this subject, we said, in *Consolidated Sch. Dist. v. Thompson,* supra:

"That the occupancy by the district was under a claim of right need not be shown by any specific declaration of the occupant's, but may be inferred from the fact of its exclusive possession, making improvements on the property, and by openly and notoriously appropriate acts of ownership over it for ten years or more. *Hanson v. Gallagher,* 154 Iowa 192, 196."

See, also, *Wickham v. Henthorn,* 91 Iowa 242.

Wherefore, the judgment and decree of the district court should be, and hereby is, affirmed.—*Affirmed.*

ALBERT, C. J., and EVANS, FAVILLE, and GRIMM, JJ., concur.